Good morning. Good morning, Your Honors. Members of the Court, please proceed. The issue in this case is whether the Department's valuation of Ningbo DAFA's most important raw material, its PET bottle flake, was in accordance with law or supported by substantial evidence. I would like first to touch on the defendant's threshold argument that there was a failure to exhaust administrative remedies, which dovetails into what we feel is the threshold legal argument in this case. The Commerce Department accepted Ningbo DAFA's methodology and its valuation of the PET bottle flakes in its preliminary determination. The Commerce Department first asserted the methodology it took in a final determination at the final determination, and therefore that was our first opportunity to object to it was on the appeal. The lower court agreed with our stance on exhaustion, and this Court applies a highly deferential standard of review to the lower court findings in such regard. The lower court, in a very recent opinion on Chinese garlic, echoed the sentiments we expressed at the end of our reply brief, and I'd like to read you two sentences from its opinion. I think I'm lost. Are you finding some error, per se, that Commerce, in the final determination, used a different methodology than it had used in the preliminary? It did, but this relates to they've claimed that we failed to exhaust our administrative determination, and so that puts every respondent in a very difficult position. If we have to brief every clause of the statute and every clause of the Code of Federal Regulations in our case brief in anticipation of any possible final result, then that puts an undue burden on the respondents, and the judge agreed with us in the lower court, and another court ruled on this very specific issue on May 13th, in a slip opinion, that said when the Commerce Department first asserts a methodology in its final results, it opens the door for respondents to object on appeal, and I can cite you the slip-up number. What court is that from? This is from the Court of International Trade, and it's a garlic case, and I might end up butchering the company's name here, but it's Zhengzhou Harmony Spice Company, and it's at page 63, footnote 49, and I've essentially said what it's, I'm happy to quote from it if you want me to, but that's what this says. It says it expressly, and the lower court judge read our briefs, took oral argument on that issue, and ruled in our favor that we did exhaust our administrative remedies adequately. Now, what we... Did you not object at the final determination hearing? Well, the final determination is the last decision of the case. Okay. So... So you're saying you didn't have the opportunity... So they wrote... The first time we saw their methodology was in writing in their final determination, and it contradicted their preliminary determination, their verification report, and everything else in the final determination. So this segues into what we feel is the threshold legal issue in the case from our standpoint, and that is that the Commerce Department did not apply the correct law or the correct legal standard in the final determination with respect to the valuation of our pet bottle flicks. The law is very clear. It's 19 U.S.C. 1677 b, and that law says that the valuation of factors of production shall be based on the best available information regarding the values of such factors. It's right in the law. Now, the Commerce Department cited that law 23 times with respect to other issues in its final issues and decision memorandum. It applied that law and the correct standard with respect to every single raw material in the case, including other very important pet raw materials that were used by other respondents. Then, all of a sudden, when it came to Ningbo Dafa's pet bottle flicks, it cited a completely different law, the facts available law, which is 1677 e. So the Court of International Trade actually agreed with Ningbo Dafa. Is your point that they had to use b and only b and e was ineligible for use? That's right. We... Well, why would that be? Because I just read the law. The law... The Congress specified that when it's a non-market economy case, that the valuation of the factor of production, the pet bottle flick, or factor of production, one of the raw materials we use, shall be based on the best available information regarding the values of such factors. It's very clear under Chevron 1 that no one, the Court doesn't have discretion, the agency doesn't have discretion to apply a different law to our value, the value of our factors of production. And in fact, in the majority of cases, Chinese respondents don't have market purchases. So the information is always missing and they always apply this statute in default India for the value. But doesn't 1677 e apply whenever necessary information is not available on the record, really trumping b? No, it doesn't. They're mutually exclusive. What's your support for saying they're mutually exclusive? The statutory construction and the black letter of 1677 b. Is that consistent with LASCO versus the United States? Absolutely. LASCO and Shapeproof, which you're very familiar with, both reiterated what I've said here. They said that when you value factors of production, you must resort to 1677 b. The cases cited by the other parties for generic facts available are not non-market economy cases. The way it normally works, in this case, the producer is in a non-market economy, but the precursor materials were purchased in a market setting. Why doesn't that justify going outside the confines of b? Because b governs this, the best information available on the record, we argued, and actually everyone agrees, was a set of 58 market-qualified invoices, but they have to apply the correct standard of law. They can't apply a different law that doesn't apply to the valuation of those invoices. Well, that's the issue I'm trying to examine, which clause applies, and they both apply. There's a regulation that permits the Commerce Department to rely on actual market purchases because they deem them to be more specific than some generic number in India. It's a regulation interpreting 1677 b. The regulation cannot trump the statute. The statute very clearly says valuation of factors shall be based on the best available information. They didn't apply the statute. But how do you get around the express language of 1677 e, which says it applies whenever necessary information is not available on the record, and it goes on to say under this statute, supplement 1677 b based on a plain reading? The information is almost always missing in every single case. There were 20 other raw materials in this case. Well, that's a separate argument. Evaluations were missing, and the Commerce Department cited 1677 b and applied that standard to every other raw material in this case. The information is always missing. Best available information implies that the perfect information might not be there. And so I think what the Congress intended here, since normally you're departing from the Chinese company's books in the first place, normally going to India to get the values for the raw materials, they impose a higher burden on the Commerce Department to take more than simple reasonable care in ascertaining those values. And the court in Dorbest, which is a wooden bedroom furniture from China, elaborated on this standard and said you can't read best out of the statute. Best doesn't mean reasonable. It means what a reasonable person would conclude is superlative, the best among all choices. We are unaware of any case in the history of the Commerce Department where they have relied on 1677 e to value a factor of production. Now if there was information missing about the amount of the raw material, then they could use facts available for the amount, but once they determine the amount, and that's not on appeal, everyone agrees what it was, then the valuation is governed by 1677 b. As they determined in their own issues and decision memo, as the CIT determined and quoted, and as now all the parties have determined and quoted in their appellate briefs, they switched their position. Their position at the lower court was we can do anything reasonable that we feel like doing. But now even the government and the defendant intervenors don't see a way around applying 1677 b. They're asking you to reverse shake proof in LASCO and set a new precedent after 25 years of non-market economy practice before the department. So our position is the judge at the lower court named the correct standard, but then it's not what the agency applied. So our submission would be that it's not the providence of the court or the Department of Justice to rewrite and re-justify an administrative decision based on a new standard that they did not cite or evaluate below. We do believe this is a higher standard, and we believe that for this reason alone, the case should be remanded to the Commerce Department for consideration under that standard. Now, I want to move on to the predicate for the resort to facts available. If the court assumes arguendo that they can adopt, they can use 1677 e, they have to make predicate findings. If you read their issues memo, they say, well, there were usage recipes available on the record that you could have provided and you didn't. Well, the most important comment in the whole issues and decision memo was a decision against an adverse inference saying that those usage recipes, which were written on a blackboard and erased six months before the petition was filed, could not be used to reconstruct color-specific usage of the pet flakes to convert them into polyester staple fiber. The colors on the invoices, which is in dispute here, is a step removed further in the process from even that. You know, the truck comes in with the polyester. They weigh it at the door. They record the weight, but not the color. This is all in the verification report that we cited. Then they throw them all in the yard. They say white over here, brown over there, red here, blue there, green and brown over here. They segregate them physically in the yard. Then they blow them. Then they wash them. Then they mix them. Then they dry them and extrude them. They melt them and then they extrude them. They're processing plastic rubbish. It's a family-run business. The general manager used to run a shoe factory. He didn't think that he had to do inventory in and inventory out at the factory gate. Inventory in, inventory out from the factory yard to the blowing. Why wasn't the recipe something they could have recreated and submitted to Commerce? It's something they do every day. I know they said they take a little here, they take a little there. But why couldn't that, knowing what the issue was and knowing Commerce's interest in that material, why couldn't they have recreated that? Well, for one, the Commerce Department verified that they could and so held in denying the claim for an adverse inference. And it's because they didn't process orders by purchase invoice. They didn't even process orders by a particular group of large sacks of dirty flakes that came in with a particular invoice because they didn't track from invoice all the way through the mixing stage. They couldn't show in books and records a specific recipe. Now, on any given day, there will be a variety of different washed flakes available to the production manager. And that changes every single day. He made up a recipe with A through Z and cited in our supplemental response. And he named up two alternative formulas from which to derive white and two alternative formulas from which to derive green. And he used 10 percent of A, 3 percent of Z, 5 percent of X. Or I could do it this other way. And I could still approximately come up with what I have to produce this day, which is this grade and this quality of this color of polyester. It's very much ad hoc done on the day. That cannot be reconstructed. Now, if if the question is, you know, how do we know generally what you use? They actually did know generally what we use because the first time we record a color was into finished inventory where we said we have so much white, so much green and so much brown polyester. We recorded 60 percent of our production into white. Thirty two percent of the production into green and eight percent into brown. So if that's the only global recipe that was on the record, if they wanted to take our 58 invoices and divide them that way, that might have been reasonable, but it would have required multiple presumptions as to the colors of the flakes that were contained in the invoices themselves. Was there evidence that that ratio was consistent over time? Yes, because it was also what we sold in the period. The selling ratio was very close to 60, 30 to eight. And white is more desirable because it's more you can use it in more instances. If you have a light colored fabric, the green and brown will show through and destroy the look of something. So white is generally more desirable. And also, if you look around you in a store, most of the bottles, the water bottles are white. There's much less green and much less brown bottle flake around. So for them to assume that we purchased 98 percent brown was actually absurd in our view and not supported by the record. Did your client submit any alternate methodologies to determine color specific values? We submitted the entire list of 58 invoices twice, first in supplemental response and then at verification. We sat in a room with them for 40 hours. And besides going through our records to determine that we could not reconstruct color specific usage, they also spent a lot of time looking at every single invoice and discussing every single invoice with us. And we said, look, all we can do is give you everything we have. We don't know the colors on these other invoices. So during those 40 hours, did you suggest, well, instead of looking at these invoices that we've given you, let's do X. We suggested from the beginning they adopted in their preliminary determination, you take the total value of all the invoices divided by the total quantity and you get a figure that is 100 percent verifiable and not subject to color specific. That would not be color specific. That's the question. Right. Did you submit any or suggest any alternatives to address the color? No, because we didn't think it would verify in the records. They were going to walk our yard and see huge bags of mixed colored flakes, red flakes, blue flakes. We weren't going to presume under any theory that that these invoices had to be white. These invoices had to be green and those invoices had to be brown. What we did have was an absolute verifiable issue of 58 invoices with a value and a quantity on them. But did the color specific issue not come up in these 40 hours of discussion? That's when we went over the invoices and they looked at them and they never suggested, gee, well, we're not going back to Washington without colors. What they looked at and what they wrote in the report is that the colors weren't on there. But are you saying that during those 40 hours the color issue was not considered? It was examined because they looked at every single invoice and so, you know, they had the opportunity under the regulation to issue us a questionnaire after verification if they wanted to. We knew we gave them something that was 100% verifiable, not based on speculation and guesswork. But they were looking for color specific information were they not? They looked at what we gave them and they were satisfied. I realize that. And that's what the report says. They were looking for color specific information. Right. And that's why the statute says best available information. In the perfect world, we'd be out of this case with a double digit negative margin if we had colors on those invoices. Boy, don't we believe we had colors on those invoices. On the other hand, our margin was negative anyway, no matter any reasonable way you do this case. It's not a close case. It's a single digit to double digit negative margin case under any one of multiple, oh, I'm in red here, so I better stop. All right, we'll recuse and bring club time back to Mr. Tosini. Thank you. May it please the court. Under Commerce's judgment, color specific valuation of the main input for the subject merchandise was necessary. Nobody contests the fact that white PSF, the white subject merchandise, was more expensive than the green PSF, and which was more expensive than the brown PSF. Likewise, on the record, nobody contests that white pet flake is more expensive than green pet flake, which is more expensive than other colors of pet flake. Department of Commerce realized this fact. All of the parties realized this fact. And in fact, if you look at pages five through seven of the trial court slip opinion, Judge Tukalos went through the multiple opportunities and the multiple questionnaires that the Department of Commerce sent to the plaintiff in order to get a handle on exactly how much of what color was purchased and what the price of that merchandise was. When did Commerce first inform Ningbo that it was going to rely on a color specific value methodology? Commerce first notified, specifically notified them in the final results. However, Ningbo was on notice that this particular methodology was in play. If you look at page 2043 and 44 of the joint appendix, the petitioner submitted a case brief to the Department of Commerce where they specifically asked the Department of Commerce to construct a facts available value for the major input to this merchandise. And under Commerce's regulation, 19 CFR 351.309, any party, interested party, if it wishes to have the Department of Commerce address some, a contention, must in their case brief address the contention. So afterwards, Ningbo was provided with the opportunity to file a rebuttal brief. And if it wanted to object to the petitioner's request that they, that Commerce use, rely upon the facts available, it had the opportunity to do that there. In fact, it had the obligation. And then the Department of Commerce in its final determination was obligated to address every one of the comments made by interested parties in the case briefs. And the regulations are very clear to that effect. So are you saying that Ningbo waived its right to challenge this since they didn't raise it or object to it in their reply? Well, they didn't waive their right to challenge everything. To challenge the facts available. To challenge the, basically the lawfulness or the permissibility of relying upon the facts available. The trial court disagreed, although the trial court never made any sort of legal findings with respect to whether Commerce permissibly relied upon the facts available. But something implicit in the Department of Commerce's decision, which we really can't get away from here, is that this was the best available information to the agency. It was the color-specific value of the primary input for the subject merchandise. And that was, that was very important. There was a strong correlation between the price of the input and the price of the finished merchandise, which nobody denies here. And no other party provided an alternative methodology that took this critical characteristic of the merchandise into, into account. Anything else? No, I believe our brief discusses the remaining matters. Mr. Smith? One question before you sit down. The sample that was used by Commerce to determine the color-specific value determination, or to make that determination, was very small. I know that there were roughly 64 invoices submitted, but only seven of those invoices contained references to color. So essentially less than 5% of the invoices were used to make this determination. Is that a fair methodology? And if so, why? Yes, it's a fair methodology. There's no evidence on the record demonstrating that those invoices were distortive under the facts available. But not that they're distortive, but is that a fair, to take such a small sampling, is that a fair representation of what was used? Yes, the Department of Commerce believes so based on its expertise and based upon the evidence. And there's been no demonstration, and in fact it's the respondent's burden to create an accurate record. And there's been no demonstration of any sort of distortion caused by the use of the color-specific invoices. And those are the invoices that happen to have denoted the color. And there's no reason to believe that those invoices would be inaccurate for the purpose that they were used. But maybe there's some inaccuracy injected into the conclusion that, well, that 98% that were not identified by color should be treated as brown. Yes, and that's, the methodology that the Department of Commerce used admittedly is not perfect. Commerce had to rely upon the facts available to deal with this critical characteristic of the subject merchandise. The question is not whether it was perfect. The question is whether it was even reasonable. We believe it was reasonable for a number of reasons. First of all, if you look at the last page of Ningbo's reply brief, they ask for the court, their first request is that they ask for the court to impose a methodology of averaging the prices over all of the invoices, which would even amplify the effect with respect to brown because you'd have known white and green invoices being averaged together to get a value for brown. First of all, that's the most important aspect of it. Second, the Department of Commerce in weighing the evidence here found that by using the invoices of known color for white and green, which was 92% of the subject merchandise that was ultimately sold, in weighing the evidence, Commerce concluded that this was the best way to solve this particular conundrum. And in fact, the trial court agreed between pages 16 and 18, the trial court addressed why Commerce was reasonable in relying upon white and then green and then also in, although addressing the admitted imperfection with respect to relying upon the remaining invoices for brown, noting that it was not going to re-weigh the evidence and that it did not see a better methodology on the record. And in closing, I just want to add that the Department of Commerce constantly attempts to calculate the most accurate dumping margin and in this case, there's nothing on the record to demonstrate that the Department of Commerce did not rely upon the best available information. Thank you. Mr. Smith. If I may, Your Honor, I'd like to start with Judge St. Eve's last question on whether the few invoices that we relied on, excuse me, were precise enough. And in this case, Your Honor, they were because those were actual market economy prices paid by Ningbo Dafa for that input. For all the other surrogate values we used in this case, we go to India and we use a basket tariff classification to evaluate. This court has found that market economy prices are more accurate than any other information. Yeah, but the issue isn't India surrogates versus market prices. The problem is whether the few documents that showed the color are representative or whether they're outliers and that many of the sales of the white flake might have been at a much lower price. They are representative, Your Honor, because we have information from the other recycled producer in this case. It's at page 30 of our brief. Mr. Medegaz was also counsel to the other recycled producer in this case and he submitted color-specific pet flake values for that other producer. And by, and when you compare those values, you will see that the fax available values that the Commerce Department calculated for Ningbo Dafa were identical to the flake values, color-specific flake values Mr. Medegaz submitted on behalf of the other recycled polyester producer. And when he submitted those to Commerce, he said, Commerce, you should use these because they could produce a more accurate margin calculation. Why was it reasonable, though, to attribute roughly 98% to Brown when Brown accounted for only 8% of production? Commerce doesn't tie, the respondents have admitted this in the reply brief. When Commerce has respondents report values, they don't do it on a production basis. They have them report period values, period values, because they don't make them go back and cost out the merchandise that was actually produced in the period. Although they may not report them on a production value, was it reasonable to kind of turn the head to the fact that only 8% of the production was Brown? I will tell you, it's more reasonable than using the single average that they supplied. Remember, we're not arguing about the 58 invoices. They're just arguing that it's a more accurate result to use a simple average when we're arguing that Commerce was correct to segregate out white, green, and then use the balance. This is really a fax available case. And you hit the nail on the head in your first question. Fax available trumps the factors of production statute. And what Mr. Medegaz failed to note was a statement of administration action in this case. In the Timken case, this court acknowledged that the SAA is binding on it in the interpretation of the law. The SAA with respect to the fax available provision says, Commerce may resort to fax available when necessary information is missing from the record. It does not need to show that that information is the best alternative information. It only needs to show that that information is reasonable under the circumstances. Judge Lynn also reached that conclusion in the NSNTN case, I believe, when he said that fax available information only need be reasonable under the circumstances. And you cannot divest the Commerce Department of that authority. Congress understood that these cases are conducted under a short timeline with literally thousands of decisions that need to be made. And they put the fax available provision in there as a catch-all to allow Commerce to create a value when there are gaps in the record. And that's exactly what Commerce did here. And to your question, Judge Saini, about when Commerce was first notified, I would direct you to page 3 and 4 of our brief. I don't often write a separate statement of the fax, but I did in this case because not twice. When Ningbo was first notified. When Ningbo was first notified. I don't often write a statement of fax, but twice Commerce notified Ningbo DAFA in bold underscore language, which stressed it, that you must provide your market economy purchases a gross pet flake segregated by color. On the final occasion, in bold underscore Commerce said the department is providing Ningbo DAFA with a final opportunity to provide a market economy purchase spreadsheet for gross flake inclusives of the color. They then warned them that they would use fax available if they didn't supply that data. Ningbo DAFA failed to supply it, and then the factual record closed. How did they warn them of it? I don't remember seeing it. These are deficiency letters. Under the law, Commerce gives, under the statute, they give Commerce a second bite, excuse me, they give the respondents a second bite at the apple. In this case, they gave them three or four. And in those letters, they specifically told them if you don't provide the information separated by color, we will use fax available. Yes. Anything else? One other thing, Your Honor. Mr. Meneghuez said that he was aware of no case where Commerce had used fax available to value a surrogate value that in the retail polyester carrier bag case, which this case affirmed in a non-presidential opinion, but Commerce valued electricity using adverse fax available in that case. Remember, they didn't use an adverse inference here. They just used the data as submitted by Ningbo DAFA, and they carved out the white and green pet flake. All right. Thank you. Rebuttal? What will I get for rebuttal? Five minutes. Thank you very much, Your Honor. Let's start with the government's position. In our case brief, we explicitly said that the best available information should apply, standards should apply. They didn't apply that in their final determination. Their final determination is contrary to law. We did not exhaust a remedy there. It's a legal issue for this court to decide whether they applied the correct law in their final determination. With respect to the other issue as to whether a handful of invoices could be reliable, we also addressed that issue at A2062, A2065, and A2068, where we talked about a small percentage of supplier invoices cannot provide enough insight to construct color-specific costs for the flakes. Now, we were talking about invoices before. Just to get the facts straight, there were 58 invoices with 64 lines on them. The number of invoices isn't important. What's important is the quantity in those invoices. They used 0.41% of the quantity to apply to 60% of our costs. That is totally unreasonable and not supported by substantial evidence. And then they say there's nothing. Why is it unreasonable? What's the indication that the cost value so obtained was way off the true value? Because if you look at all the invoices like they did and put them on a sell sheet like they did, there's a $100 drop-off off the invoice they used for all of our white. It was one supplier on the other side of the world that basically three contracts for one container that all had the same unit value. It's basically one contract. The highest value, the next one drops off by 100, and then they drop off by 100 more and 100 more. What they did after they took those three invoices for one container each off the top, they assigned the next 39 highest unit value invoices to Brown. That's absurd. It's not supported by substantial evidence on the record. They peppered their briefs with general evidence and anecdotal evidence which we don't dispute is general, that white costs more than green which costs more than brown.  of the top 43 line item unit values to Brown. And what they did is they robbed the white and the green of other invoices that would have fairly averaged down their color-specific costs. And this requires all kinds of assumptions. This requires that every supplier charges the same price, that the price stays static over the six-month POI. And it also makes big assumptions about the quality. The best quality green might sell better than the lower quality white. We weren't going to make all those assumptions. What we did have is a 100% verifiable number. We gave them everything we had. We worked with them in a room for 40 hours. There was never a suggestion that they could do what they did and what they did is not supported by substantial evidence. Now, I would say even if someone draws an adverse inference, it has to be representative. What they did was not representative of our database as you pointed out. And it certainly wasn't reasonable, but our argument on appeal is that they had to apply a different standard, the best available information standard. If we had no market purchases, the information would not, it would have been, in their words, necessary, but it would not have been available and they would have gone to India for the value. So the only information that was on the record was a data set of 58 invoices, most of which didn't have a color. If they want to apply 0.41% of our tonnage to the value they selected, that's fine. But then for the other 98% of the value, take it from the basket unit value and then we would be in double digit negative numbers. They say the information is not on the record. It was on the record because my other client's values for gross dirty flakes were on the record, not the ones the petitioner suggests. They're like saying you should compare lump crab meat to whole crabs. They're totally different products. The unwashed goes through, has to go through three stages of processing to have the same value as the washed flakes. And so the information was on the record that what their final decision was highly disappointing. Let's see, I just want to address some of the petitioner's claims. Well, they talk about the production link. Of course there was a production link because they said what did you buy in the six-month period and what did you produce in the six-month period? Well, we bought 58 invoices and we produced 60% brown and 32% green. We couldn't possibly have produced what they verified with their own eyes that we produced if all we were buying was brown. And so there absolutely is a linkage because we showed them we only had two months of inventory. There would have been no flakes in the yard and we would not have been able to produce what they verified we produced. They also cite an adverse inference case on electricity. Adverse inference is when you don't have the data. I lost my electricity records and so they apply some adverse inference for that. The value of electricity is always taken from India. The value of electricity cannot fail to cooperate in an investigation. So whatever they're talking about with electricity has nothing to do with this case. Adverse inferences and facts available apply to the data, the amount of the input, not to the value. The value is found as Congress specified in 1677B. Let me just ask you one question. I understand Mr. Smith to be saying that E is always available and in fact trumps B. In contrast, your argument seems to be that B and only B can ever apply in a case like yours. Now the question is, what's the legislative history or SSA statement to support or refute these completely opposing understandings? Well, you have your court's ruling in Lascaux and shake proof and the lower court's opinion agreeing with us that 1677B applies. When you're talking about the valuation of the factor, not the amount of the factor, 1677B applies with 25 years of precedent in support of our position. You don't have a single precedent in support of their position. All right, we thank you all. The case is taken under restriction. I appreciate your time, Justice. All rise.